UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

           Plaintiff,

    v.                                    Case No. 09-cr-20382
                                      Hon. Steven J. Murphy, III

WILLIAM BORGIDA,

           Defendant.
_____/

**DEFENDANT'S SENTENCING MEMORANDUM**

It is by now a commonplace of post-*Booker* sentencing jurisprudence that in weighing the sentencing factors set forth in 18 U.S.C. § 3553(a), a sentencing judge "must make an individualized assessment based on the facts presented" by the case, and although a correct Guidelines calculation of the applicable "should be the starting point and the initial benchmark," the court "may not presume that the Guidelines range is reasonable."*Gall v. United States*, 522 U.S. 38, 50 (2007). In the case at bar, the Guidelines as calculated by the parties call for a sentence of between 57 and 71 months, and by the Probation Department, between 70 and 87 months, but the dominant feature of the sentencing landscape against which the Court may exercise its discretion is defined by the mandatory minimum sentence of 60 months set by the statute to which defendant pled guilty.

This is especially true because the history of the applicable Guideline provision, § 2G2.2 makes clear that the offense levels it defines - including the application of the enhancements applied in the case at bar - were set with the intent that they conform to the statutory mandatory minimum.

*See,* United States Sentencing Commission, The History of the Child Pornography Guidelines, 44-48 (2009) http://www.ussc.gov/general/20091030_History_Child_Pornography_Guidelines.pdf, as viewed January 4, 2010. This circumstance, of course, only serves to magnify what is *always* true of the Guidelines: that they present an essentially one-dimensional picture of the totality of the circumstances upon which this Court's sentencing decision must ultimately depend, and one, because they focus almost exclusively on the nature of the offense conduct involved, tend inevitably to skew toward severity. On the other hand, both common sense and the sentencing statute - if not the Guidelines - dictate that an offender be sentenced on the basis of not just his transgression, but on the entirety of his life.

This being said, "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), are inexorably intertwined, and the Presentence Investigation Report (PSI) reflects aspects of both which are (perhaps unsurprisingly, in a case involving child pornography) disturbing, and which should be addressed at the outset of this discussion.

First, as Paragraphs 9 and 10 of the PSI report, at the time of his arrest on the instant charges, Mr. Borgida was also in possession of maps of Singapore and Thailand, which are known as "sex tourism" destinations, and which Mr. Borgida acknowledged having traveled, as well as "several sex toys, women's lingerie, two bags of candy, children's toys, stuffed animals, crayons, and a coloring book," as well as photographer's "Model Release" forms. Second, Paragraph 33 reflects a June, 1981 incident in which a sixteen year old student of Mr. Borgida's at the Trumansburg, New York, high school where he was then employed, reported that during a tennis lesson (Mr. Borgida

2

was a math teacher and tennis coach at the school), he "began tickling her, grabbing her around the waist, and attempted to kiss her," that he "fondled her breasts, placed his hand in her pants, and touched her genitals," and that he warned her not to tell anyone about the incident "or he would have to 'arrange her cute little nose.'" As the PSI reports, this accusation resulted in criminal charges, which were ultimately dismissed.

These circumstances must, of course, be read in light of Mr. Borgida's explanations. Thus, as he stated to the Customs agents at the time of his arrest, and in the version of the offense found at Paragraph 15 of the PSI, some of the items which he had with him were used as photographic props - for adult female models whom he hired to pose for him, and whose age he verified when he thought it questionable - and some (such as the children's toys, crayons, and coloring book) were intended as gifts for his dance partner's daughter. This latter statement is verified by the letter of Laura Malloy, his dance partner, which may be found as the first submission under Tab Four, and which explains as follows:

> I have a 3 year old daughter, Sadie, and I am a full-time mother at home. Bill and I have often worked together at my house or his while Sadie is with us, resting or playing nearby. That has been the case from the time she was several months old. He has always been appropriate in every way, and she is always happy to see him. Bill has brought her small souvenirs or toys back after long travels on several occasions. . . . I have told Bill how happy I am that she loves to draw and color, as her Daddy is a talented artist. Bill mentioned specifically that he had found a cute coloring book for her, along with some other little things to bring back on his next trip home. Bill and I had this conversation prior to an apparent search of his belongings, when some of these items were found. I am fully confident that these were intended for Sadie.

Mr. Borgida's travels to Southeast Asia, which he freely acknowledged to the arresting agents, were undertaken in connection with his activities teaching dance, and because of his lifelong interest in Buddhism.

As to the 1981 incident, while Mr. Borgida recognizes the impropriety of his actions with a 16-year old student, and the coercion inherent on any such encounter, he denies - and denied to the investigating authorities in the first instance - that he physically forced himself on her, or threatened her in any way to remain silent.

Nonetheless, the writers would be naive to ignore the suspicion that these circumstances may give rise to - that in addition to an unhealthy interest in viewing images of children, and therefore feeding an industry that inevitably thrives on their abuse, Mr. Borgida may have a history of, and therefore pose a risk of, personal involvement in the abuse of minors. While this accusation is not squarely made in this case, of course, such considerations are certainly within the range of factors which may bear upon the Court's evaluation of "the nature and circumstances of the offense and the history and characteristics of the defendant," and, in fairness to all concerned, must be squarely addressed. Mr. Borgida, and undersigned counsel, have taken a number of steps in order to attempt to do so.

First, under Tab One, is the report of certified polygraph examiner Christopher Lanfear. Mr. Lanfear, a 25 year veteran of the Michigan State Police, who retired from that agency as a Detective Lieutenant, has a long and distinguished history in law enforcement which is not limited to polygraph work - although he has administered more than 3700 examinations for more than 200 different agencies, state and federal. In addition to his private practice, he currently serves as staff

polygraph examiner for the Oakland County Sheriff Department and the Troy Police Department. His skill, experience, and integrity are unquestionable. A copy of his *curriculum vitae* follows his report under Tab One. As the report states, Mr. Lanfear's examination of the defendant verified that he was being truthful when he denied ever having sexual contact with "any underage person," other than the 28 year old incident with his sixteen-year old student, or ever having taken any unclothed photographs of "any under age person," with the exception of a single incident in which a seventeen year old model had presented him with false identification showing her to be of age.

Under Tab Two are a report of a forensic psychological evaluation of Mr. Borgida, and the CV of the evaluator, Matthew L. Ferrara, Ph.D., a licensed psychologist and sex offender therapist in Austin, Texas. The primary thrust of Dr. Ferrara's inquiry was in the nature of a "risk assessment," and as the report explains in some detail, his conclusions are that Mr. Borgida presents "a low risk for future sex crimes,"[1] and that his prognosis for successful psychological treatment is good, based on his "demonstrated the ability to hold himself accountable for his conduct," his "good empathy for others," and his motivation "to participate in treatment and make changes in himself."

This latter observation is borne out by the report, attached under Tab Three, of Shelley Graham, Ph.D., a licensed professional counselor and a licensed sex offender treatment provider in the State of Texas, who began seeing Mr. Borgida on a therapeutic basis after his arrest in this

---

[1] Interestingly, Dr. Ferrara opines that such a low risk of participation in other criminal sexual activity "is consistent with research regarding offenders who use child pornography." This seems to be the consensus view in the psychiatric/psychological research community. *See, e.g.,* J. Endrass, F. Urbaniok, L. C. Hammermeister, C. Benz, T. Elbert, A. Laubacher, and A. Rossegger, The Consumption of Internet Child Pornography and Violent and Sex Offending (BMC Psychiatry 2009), http://www.biomedcentral.com/1471-244X/9/43, as viewed January 5, 2010.

case, "to assist him in dealing with his stress and anxiety over his court/legal issues, and to begin work on sexual behaviors - specifically interest in child pornography." She reports that he "has been responsive and motivated for the counseling process," and she describes him as "basically a pro-social individual, who could be expected to learn from his past behaviors and resulting consequences, and whose "prognosis for benefitting from a treatment program appears good."

The experience of living in this world teaches us that human beings, and human lives, are usually multifaceted, that a person cannot be fairly judged on the basis of only one aspect of his or her life, and that looking at a person's entire history is as good a way as any of taking his measure. Attached under Tab Four a number of letters from Mr. Borgida's family, friends, and associates, whose experience of him will hopefully will assist the Court in making a fuller, more rounded appraisal of him, the life he has led, and the life he is likely to lead in the future.[2]

The people who have opted to speak for Bill Borgida come from a variety of walks of life, but many of them know him through, and share his passion for, dance - specifically, Swing Dancing, and the Lindy Hop, of which he is a preeminent teacher. Much of what they have to say about him concerns his conduct in that role. Thus, echoing a theme which is repeated throughout the letters, Karen "Casey" Carr, who has a background in social work in psychotherapy, "with a specialty working with children and adolescents," and who has served as a Probation Officer and Director of a Halfway House, reports that after traveling with Mr. Borgida as part of dance troupe for "many

---

[2] To comply with the redaction requirements of F.R.Cr.P. 49.1, the electronically filed version of these letters has eliminated all but the city and state in the home addresses of the correspondents. The originals of the letters, which are being submitted with the Judge's copy of this memorandum, have not been so redacted, and counsel will send an unredacted set of the letters via e-mail to government counsel and the probation department.

years," she "was always impressed with Bill's kindness, thoughtfulness and ability to find the good in everyone . . . one of those people who 'would not hurt a fly,'" that over the years of his work with dance students, "[n]ever once was there any indication of impropriety," and that since his arrest, "the pain he has already suffered and the countless hours of personal deliberation he has engaged in has been life changing." Others, of course, express similar thoughts:

> [T]he bigger picture clearly reveals someone who consistently conducts himself with propriety. We who know him well. know that while enriching the lives of countless friends and students. Bill has always acted with integrity and heart.

Susan A. Kramer

> I saw only a professional, warm individual who loved his craft and the respect and admiration that his pupils gave him. At no time did I see any behaviors that would be considered inappropriate. . . . Bill has always been one of my favorite people due to his kindness, willingness to help others, and positive attitude.

Kimberly Hardi (former elementary school teacher)

> To give you an example of the type of man Bill is, when we both resided Ithaca, New York, every year during the holidays, Bill would open his home and his heart and extend an invitation to all in the dance community whose families lived elsewhere and who would otherwise be alone. All were welcome. No one was excluded.

Kathe Kauffman

> I would characterize Mr. Borgida as talented, gracious, highly intelligent, creative and friendly. I have never seen him lose his temper or intentionally cause anyone distress. I have frequently observed Bill working with children and young adults and have never witnessed nor been told of impropriety of any sort. Bill consistently observed proper etiquette and I did receive very favorable feedback from both the children and their parents.
>
> I well understand the nature of the very serious charges that have been brought against Mr. Borgida and his full admission of responsibility. I have on several occasions worked professionally with individuals who have been convicted of these and considerably more egregious, sexually oriented crimes. Based upon my training,

> experience and personal knowledge of this individual, I sincerely believe that Mr. Borgida has the integrity, intelligence, sensitivity and responsibility required to learn from this experience and to change his behavior accordingly and permanently.

Howard Schler, Certified Rehabilitation Counselor. New York State Licensed Mental Health Counselor. and Chairman of the Seneca County (NY) Community Service Board

> Bill treated everyone the same: with respect, professionalism, and a sincere wish to help them learn to dance. . . .My experience with Bill is that, more than anything else, he loved to dance and wanted to spread the joy of dancing to as many people as he could. . . . Bill has helped many, many people learn to dance, and to each of them he has given a gift.

> Bill has expressed to me his remorse for what he has done. He told me he had assumed he wasn't hurting anyone since his activities were "behind closed doors." Now he sees how his actions were part of a larger problem, and he is sorry and ashamed for having contributed to that.

Diana Leigh

> Bill has contributed endless hours, much of it uncompensated, to organizing and supporting our local dance community, putting on benefits and special events, arranging for workshops and regular dance venues. He has been very dedicated to promoting quality instruction, music and social dance and encouraging people of all ages to learn to enjoy swing dance and music. He has been a tireless supporter of the often poorly paid swing musicians in town and around the country. His reputation extends internationally to countries such as Japan, Sweden, France, New Zealand, and England.

Cindy Overstreet, M.S.W.

> Bill knows that he participated in harm by supplying a demand. His remorse is palpable and heartbreaking. He is a very good man who did something regrettable.

> To know Bill is to know someone who cares about people deeply, who has perfected his professional craft from a concern to better the lives of his students.

Andrew Poles

> During the years that I taught swing dance with Bill, our classes had mostly young adults, adults, and some teenagers. Bill was a friendly yet professional instructor who interacted with respect and appropriate physical boundaries with his students. . . .
>
> I have grown into a happier person because I have known him and learned from him.

Katherine Isacks

> Bill is a and valuable part of the lives he touches, both close to home and to dancers around the country and the world. He is a pillar of the dance community.

Frances G. Courtney

> Over the years, I have frequently seen Bill interact with people of all ages, both on and off the dance floor. He has always dealt with others, particularly women and girls, in an appropriate and respectful manner. . . .
>
> He has a gift for recognizing the potential in others and helping them to develop it. Overall, I believe that Bill has the character and integrity to make the best of this present difficult situation. I'm sure he will examine himself and his past behavior and make changes for the better where they are needed. He has a good mind and a generous heart; he would not knowingly hurt others.

Gretchen Herrmann, Ph.D., former Woman's Studies teacher and coordinator

> Bill was forthright in admitting his personal responsibility -and in fact, his disgust in himself. He understands that by looking at porn he has helped to create a market for it and that he has essentially encouraged the makers of porn and in this case child pornography. Bill finds that idea -that image of himself- to be abhorrent. He told me very directly that he feels awful -not just for his re-assessment of himself, but for the effect he has had on others. We discussed this aspect in detail and I believe that Bill's remorse is genuine and deep. I believe Bill feels revulsion for his part in looking at porn and helping to create an environment where pornographers can benefit from abusing kids on any level.
>
> I have never seen Bill acting inappropriately with my students. Bill has maintained his popularity as a teacher with my students which suggests to me that he did not act inappropriately when I was not there. I should point out that, at age 48, I do feel protective of my students most of whom are in college. My wife (who teaches with me) and I feel an obligation to watch over our students and make sure that they are safe while we are around.

> In all the years of being at dances, most of which are attended by younger people, Bill never said anything inappropriate, sexist or lewd about any of the young women at the dance. To be honest, I have seen many guys leer at women at the dances; Bill does not. At dances, people enter a world of make-believe grace and romance. People make contact, smile and flirt more than in real life: there is every "excuse" to make 'locker-room' comments -but I have never heard Bill do this.

Greg Avakian

Pleas made on behalf of defendants in criminal cases often hinge on the claim that their criminal conduct "stands in stark contrast" to the rest of their lives. As often as not, these claims are based on no more than a negative - that the defendant has never been in serious trouble before. This is not the case here: Bill Borgida's life has been marked by a pattern of admirable, even exemplary, works and achievements. Both common sense and the sentencing statute - if not the Guidelines - dictate that an offender be sentenced on the basis of not just his transgression, but on the entirety of his life. Here, it is fair to say that, fairly viewed, Bill Borgida's life - "the history and characteristics of the defendant" - counsels a degree of leniency not recognized by the Guidelines.

The writers recognize, of course, that the Court's inquiry does not stop here. The information above focuses on one half of the considerations outlined in subsection (1) of § 3553(a): "the history and characteristics of the defendant." The command of § 3553(a), of course, is that the Court "impose a sentence sufficient, but not greater than necessary, to comply with" the traditional aims of sentencing: retribution, deterrence (both general and specific), incapacitation, and rehabilitation, as set forth in subsection (2) of the statute.[3] The Court's appraisal of the "nature and circumstances

---

[3] The "traditional purposes of punishment . . . include retribution, rehabilitation, prevention of further crimes by the defendant, and deterrence of the defendant and others who might

of the offense," as also directed in subsection (1), is intrinsically tied up in these considerations - including, most obviously, the question of what constitutes "just punishment." Here, defendant maintains that "just punishment" should not exceed the statutory mandatory minimum sentence of 60 months, notwithstanding that the Guidelines may call for a greater term.

In the ordinary case, as the Supreme Court noted in *Rita v. United States,* 551 U.S. 338, 350 (2007), "it is fair to assume that the Guidelines, insofar as practicable, reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." This assumption, however, is premised on the underlying notion that the Guidelines in a particular case represent the product of the exercise of the Sentencing Commission's well-defined role in the federal sentencing scheme, as the Supreme Court described it in *Kimbrough v. United States,* 552 U.S. 85, 108-109:

> Congress established the Commission to formulate and constantly refine national sentencing standards. See *Rita v. United States*, 551 U.S. 338, ---- - ----, 127 S.Ct. 2456, 2464-2465, 168 L.Ed.2d 203 (2007). Carrying out its charge, the Commission fills an important institutional role: It has the capacity courts lack to "base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise." *United States v. Pruitt*, 502 F.3d 1154, 1171 (C.A.10 2007) (McConnell, J., concurring); *see supra,* at 1171.

In contrast, the offense provision applicable in this case, § 2G2.2, has been repeatedly amended, at times at the specific direction of Congress, and, as previously noted, to conform with mandatory minimum sentencing provisions[4] which have been enacted over its history, and with the

---

contemplate committing similar crimes. *Hobbs v. County of Westchester,* 397 F.3d 133, 158 (2d Cir. 2005) (citing 1 W. LaFave, Substantive Criminal Law § 1.5(a)(2d ed.2003).

[4] Specifically, the Sentencing Commission has noted that the offense levels set in § 2G2.2 were devised with the idea that the Base Offense Level of 22, "when combines with several specific offense characteristics which are expected to apply in almost every case (e.g., use of a computer, material involving children under 12 years of age, number of images), the mandatory minimum of

result that the penalties which it calls for in the mine run case have increased by staggering orders of magnitude. *See, e.g.,* T. Stabenow, Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines, pp. 26-30 (2009), http://www.fd.org/pdf_lib/child%20porn%20july%20revision.pdf, as viewed January 5, 2010 (illustrating, via sample cases, increases between 567% and 1,750%).

While some of these increases may (or may not) be consistent with evolving public policy concerning or understanding of child pornography offenses, they clearly do *not* represent the product of the kind of work which is expected of the Sentencing Commission, as Chief Judge Bataillon explained in *United States v. Bennett,* 2008 WL 2276940, *4 (D. Neb. 2008):

> The Guidelines were developed to advance sentencing reform goals of reducing sentencing disparity, assuring certainty and severity of punishment, and increasing the rationality and transparence of punishment. *See* United States Sentencing Commission, Fifteen Years of Guidelines Sentencing at 11-12 (Nov.2004) (hereinafter, "Fifteen-Year Assessment"). The Sentencing Commission ("the Commission") was originally charged by Congress with developing guidelines to meet the "purposes of punishment" set out in § 3553(a)(2), and to achieve proportionality, crime control through incapacitation and deterrence, and rehabilitation. *Id.* at 12-13. Toward that end, the Commission developed and used data on past practices and recidivism in formulating the Guidelines. *See id.* at 14 (noting that the Guidelines are based in part on statistical analyses of pre-Guidelines sentencing practices); U.S.S.G. § 1A.1, intro. comment., pt. A, ¶ 3; *Kimbrough,* 552 U.S. at ---, 128 S.Ct. at 567 (regarding drug trafficking guidelines). Based on sentencing statistics, the Commission established the base offense levels for each crime, linked to a recommended imprisonment range. Fifteen-Year Assessment at 14. Accordingly, in many cases, the Guidelines represent a reasonable estimation of a fair sentencing range. *See Kimbrough,* 552 U.S. at ---, 128 S.Ct. at 564 (noting that in the ordinary case, the Commission's recommendation of a sentencing range will reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives).

---

60 months' imprisonment will be reached or exceeded in almost every case by the Chapter Two calculations." Commentary, "Reason for Amendment," accompanying Amendment 664.

However, for policy reasons, and because statutory mandatory minima dictated many terms of the Guidelines, the Commission departed from past practices in setting offense levels for such crimes as fraud, drug trafficking, and child crimes and sexual offenses. Fifteen-Year Assessment at 15, 72-73; *see Kimbrough,* 552 U.S. at -, 128 S.Ct. at 567. Consequently, the Guideline ranges of imprisonment for those crimes are a less reliable appraisal of a fair sentence. *See Kimbrough,* 552 U.S. at -, 128 S.Ct. at 574. In cases involving application of Guidelines that do not exemplify the Commission's exercise of its characteristic institutional role---basing its determinations on " 'empirical data and national experience, guided by a professional staff with appropriate expertise,' "-it is not an abuse of discretion for a district court to conclude when sentencing a particular defendant that application of the guideline will yield a sentence "greater than necessary" to achieve the purposes set out in § 3553(a). *Kimbrough,* 552 U.S. at ---, 128 S.Ct. at 574-75 (*quoting United States v. Pruitt,* 502 F.3d 1154, 1171 (10th Cir.2007) (McConnell, J., concurring)).

Reprising this theme in *United States v. Baird,* 580 F. Supp.2d 889, 894-892 (D. Neb. 2008),

he explained:

The court notes that the Guidelines for child exploitation offenses, like the drug-trafficking Guidelines, were not developed under the empirical approach, but were promulgated, for the most part, in response to statutory directives. *See* U.S.S.G. App. C, Amends. 537 & 538 (Nov. 1, 1996), 592 (Nov. 1, 2000), 615 (Nov. 1, 2001), 651 (Oct. 27, 2003), 664 (Nov. 1, 2006). The Commission itself acknowledges that "[t]he frequent mandatory minimum legislation and specific directives to the Commission to amend the Guidelines make it difficult to gauge the effectiveness of any particular policy change, or to disentangle the influences of the Commission from those of Congress." Fifteen-Year Assessment at 73. Because the Guidelines do not reflect the Commission's unique institutional strengths, the court affords them less deference than it would to empirically-grounded guidelines.

Other district judges have echoed these observations. Thus, for example, in *United States v. Shipley,* 560 F. Supp.2d 739 744 (S.D. Iowa 2008) Chief Judge Pratt wrote:

As Chief Judge Bataillon noted in *United States v. Baird,* No. 8:07CR204, 2008 WL 151258, at *7 (D.Neb. Jan. 11, 2008), the guidelines for child exploitation offenses were not developed using an empirical approach by the Sentencing Commission, but rather were mainly promulgated in response to statutory directives. Specifically, the Protect Act directly amended guideline 2G2.2 by amending the guideline enhancements for specific offense characteristics. These modifications do

13

not appear to be based on any sort of empirical data, and the Court has been unable to locate any particular rationale for them beyond the general revulsion that is associated with child exploitation-related offenses. *See* Skye Phillips, *Protect Downward Departures: Congress and Executive's Intrusion Into Judicial Independence,* 12 J.L. & Pol'y 947, 967-84 (2004) (discussing the history of the guideline modifications made in the Protect Act and the fact that the changes were made without notifying or consulting the Sentencing Commission); *see also United States v. Detwiler,* 338 F.Supp.2d 1166, 1170-71 (D.Or.2004) (discussing the Feeney Amendment to the Protect Act). Thus, because the guidelines at issue in this case do not reflect the unique institutional strengths of the Sentencing Commission in that they are not based on study, empirical research, and data, like Chief Judge Bataillon, this Court "affords them less deference than it would to empirically-grounded guidelines." *See also Kimbrough,* 128 S.Ct. at 574 (noting that guideline ranges created where the Commission departed from past practices are a less reliable appraisal of a fair sentence). As to any argument that the guideline reflects Congressional intent to punish child sex offenses harshly, a guideline is not a statute. The statute here provides a broad range of punishment for this crime, and if Congress does not want the courts to try and sentence individual defendants throughout that range based on the facts and circumstances of each case, then Congress should amend the statute, rather than manipulate an advisory guideline and blunt the effectiveness and reliability of the work of the Sentencing Commission. While the Court has consulted the advice of the guidelines, the advice in this case is less reliable than in other cases where the guidelines are based on study and empirical data.

While not all sentencing decisions are accompanied by reported opinions, it is perhaps significant to note that according to Sentencing Commission statistics, in 2008, below-Guideline sentences (downward *Booker* variances) were imposed more than *three times* more frequently in cases involving § 2G2.2 than they were overall, United States Sentencing Commission, Sourcebook of Federal Sentencing Statistics 2008, Table 28, http://www.ussc.gov/ANNRPT/2008/Table28.pdf, as viewed January 6, 2010, perhaps reflecting the generally perceived harshness of that provision, or the kind of understanding illustrated by the decisions quoted above.[5]

---

[5] It also appears, at least based on accounts in the public press, that a number of district court judges have called upon the Sentencing Commission, in testimony at public hearings, to revise the

It is to be noted that the Guideline enhancements found in this case are not unusual, and do not suggest any significant aggravation. Indeed, as the Sentencing Commission noted in its History of the Child Pornography Guidelines, *supra,* at 46, a majority of offenders sentenced under §2G2.2 are "subject to specific offense characteristics that increased their offense level. Specifically, the overwhelming majority of these offenders received a 2-level enhancement for use of a computer (89.4%) and a 2-level enhancement for material involving a child under 12 (91.4%)." *See also,* Commentary accompanying Amendment 664 set forth in footnote 4, *supra.*

At the same time, there is much about Bill Borgida that counsels a lesser degree of punishment, such as his history of generosity, caring, and good works, his deeply felt remorse and understanding of the nature of his wrongdoing, and his demonstrated desire, and ability, to change. similar considerations led to below-Guideline sentences in *United States v. Baird, supra,* at 895 (downward variance based on fact that defendant has "demonstrated remorse, . . . a low potential for recidivism and appears to appreciate the seriousness of his offense. In this connection, the court stresses the importance of opinions of the medical professionals who have examined Baird and have determined that he is not likely to reoffend and is not a predator"), and *United States v. Shipley, supra,* at 733 ("[t]he letters describe an intelligent, patient, and honorable man, always willing to help others when needed, [and] note the shame the Defendant feels for his crime"). *See also, United*

---

child pornography Guidelines in the direction of greater leniency. Denver Post, "Federal judges argue for reduced sentences for child-porn convicts," November 29, 2009, http://www.denverpost.com/news/ci_13887009, as viewed January 6, 2010 ("From New York to Chicago, and recently in Denver, federal judges have testified before the commission, which sets federal punishments, that the current sentencing structure for possessing and viewing child pornography is too severe," quoting, in part, District Judges John L. Kane (D. Co.) and Robin J. Cauthron (D. Ok.)).

15

*States v. Grossman,* 513 F.3d 592, 596-597 (6th Cir. 2008) ( approving variance based on observations that defendant "is an 'educated man,' . . .a promising candidate for rehabilitation . . . appreciated the magnitude of his crime and 'correctly [understood that] the victims in this matter were really the children who made no choices in this matter, but who were put into' a terrible situation.").

Defendant contends that a sentence at the statutory minium - 60 months - is a more than ample recognition of the misconduct in the case at bar, especially when measured against the perspective of his life as a whole. Such a sentence would also, he submits, more than amply meet the other relevant sentencing considerations.

As for general deterrence - the need to fashion a punishment which will deter the public at large from taking the same course of action as did the defendant - it seems reasonable to conclude that even the minimum sentence which the Court might impose would be a significant deterrent to the kind of errant activity involved in this case. Indeed, it is difficult to imagine that any offender would think to calibrate his conduct any differently as between such a sentence and one greater.

The same observation would seem to apply in regard to special deterrence - the need to dissuade the defendant himself from future illegal conduct. And the same may be said, *mutatis mutandis,* as to considerations of "incapacitation" - or, in the language of the statute, the need "to protect the public from further crimes of the defendant" - especially in the light of the professional opinions and evaluations submitted herewith. And as to rehabilitation, it does not appear likely that any programs offered by the United States Bureau of Prisons would be of much assistance in furthering Mr. Borgida's future professional life.

The statute also directs the Court to consider "the kinds of sentences available," "the need to avoid unwarranted sentencing disparity," and "the need for restitution." Because of the statutory mandatory minimum prison sentence, the first of these considerations does not seem to loom large and, as Paragraph 57 of the PSI notes, the last, restitution, does not appear to be an issue in the case.

As to disparity, it is to be noted that the application of mandatory minimum sentences such as the one in the case at bar inevitably tend to avoid the kind of natural bell-curves which would result from a less artificial method of weighing behavior. In *United States v. Baird, supra,* at 896, one of the reasons Chief Judge Bataillon gave for the downward variance was that it "will ameliorate the disparity in the treatment of defendants like Baird and those who commit far more serious crimes of exploitation and abuse." Such considerations have even greater applicability here, where the Court's discretion is so greatly constrained by the statutory mandatory minimum sentence.

For all these reasons, then, the Court should conclude that a sentence of 60 months incarceration is "sufficient, but not greater than necessary, to comply with the purposes" of sentencing set forth in 18 U.S.C. § 3553(a).

                                                 Respectfully Submitted,

| | |
|---|---|
| s/ N. C. Deday LaRene | s/James W. Burdick |
| N.C. DEDAY LARENE (P16420) | JAMES W. BURDICK (P11397) |
| LARENE & KRIGER, P.L.C. | JAMES W. BURDICK, P.C. |
| 645 Griswold Street, Suite 1717 | 1760 S. Telegraph Road, Ste. 300 |
| Detroit, Michigan 48226 | Bloomfield Hills, MI 48302 |
| (313) 967-0100 | (248) 335-5000 |
| E-mail: d6644@deday.net | E-mail: jwb@jwburdicklaw.com |

DATED: January 8, 2010

CERTIFICATE OF SERVICE

      I hereby certify that on January 8, 2010, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send notification of such filing to the following:

    Erin S. Shaw
    U.S. Attorney's Office
    211 W. Fort Street
    Suite 2001
    Detroit, MI 48226
    313-226-9100
    Erin.Shaw@usdoj.gov

      I also certify that I will provide a courtesy copy to the Chambers of the Hon. Stephen J. Murphy, III, and to United States Probation Officer Charmarie Green on .

                                                    s/N. C. Deday LaRene
                                                    LaRene & Kriger, P.L.C.
                                                      1717 Penobscot Building
                                                      Detroit, Michigan 48226
                                                      (313) 967-0100
                                                      E-mail: d6644@deday.net
                                                      Michigan Bar No. P16420